UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BOBBY GIRIFALCO** and **KAREN CLOSKEY,** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>**J&A GOODS, LLC D/B/A ECOVIEW WINDOWS AND DOORS, 33 MILE RADIUS, LLC** and **SOLEO COMMUNICATIONS, INC**,<br><br>*Defendants.* | Case No. **2:26-cv-01156-JDW**<br><br>Presiding:<br>**Hon. JOSHUA D. WOLSON** |

## DECLARATION OF EXPERT AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by the Plaintiffs to determine whether there is a reliable methodology for analyzing the call records in this lawsuit reflecting the calling done by or on behalf of the Defendants J&A Goods, LLC d/b/a Ecoview Windows and Doors, 33 Mile Radius, LLC and Soleo Communications, Inc. ("Defendants" as captioned).

2. More specifically, I have been asked to opine whether there is a reliable method to identify which calls in Call Detail Records ("CDRs") maintained of calls and text messages by or on behalf of Defendant were made to telephone numbers that were called and/or sent messages on two (2) or more occurrences within a twelve (12) month period to telephone numbers that were registered on the National Do Not Call Registry ("DNC") for more than thirty days (30) before the date of each of the calls and/or texts.

3. I have also been asked to opine whether there is a reliable method to

identify which calls in the CDRs maintained by or on behalf of Defendant were (a) made to telephone numbers assigned to a cellular telephone service that had not been ported within fifteen days prior to the date when called; and, (b) resulted in the transmission of pre-recorded or artificial voice messages.

4. It is my opinion that there is a reliable method to identify calls with other particular criteria based on the additional types of information included in the CDRs and/or other records maintained by or on behalf of Defendant or in any available database, such as which calls in the CDRs maintained by or on behalf of Defendant were made to telephone numbers that were on the national DNC for more than thirty days and there were two or more calls to that number within 365 days; and calls placed to telephone numbers were assigned to a cellular telephone service that had not been ported within fifteen days prior to the date when called and had resulted in the transmission of pre-recorded or artificial voice messages.

5. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

6. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

1. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

2. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[1] My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including TCPA claims.

3. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

---

[1] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

4. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services. [5]

5. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

6. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

7. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

8. I held a CPCN[6] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

9. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls.

10. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of the defendant in a case in which the Court certified a class of consumers who received pre-recorded calls to their cellular telephone numbers.

**Expertise Specifically Related to Database work.**

11. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

that I am an "expert in the compilation and analysis of databases …."

12. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

13. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

14. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the district court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 4.

15. I engaged on behalf of plaintiff Michael Anthony in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Ill.) in which I undertook a comprehensive analysis of the

Defendants records in support of class certification. The order granting class certification is attached as Exhibit 5.[7],[8]

16. I was also engaged on behalf of plaintiff Robert Mason in *Robert Mason et al v. Spring EQ, LLC* (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 6.

**Materials and Documents Reviewed and Relied Upon.**

17. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

**I. Materials that I relied upon:**

(a) The Second Amended Complaint, ECF 35.

**II. Electronic database resources that are available:**

(a) Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC.[9], [10]

---

[7] The court presiding over *Federal Savings* is currently considering a motion for de-certification.

[8] It is my understanding that the calls at issue this matter are analogous to those placed by defendant *Federal Savings* in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC*. In that matter, the calls were placed by a third party, FDE Marketing, and then transferred *to* defendant *Federal Savings*.

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10418065-518065-26.

[10] TelSwitch, Inc. is registered as an "exempt organization" – an organization that "does not make calls". This is consistent with the FCC's order stating "This approach is consistent with how the Commission approached the National Do-Not-Call Registry, which contains phone numbers that (footnote continued)

(b) Index of the North American Numbering Administrator's Numbering Plan Area Codes that are TCPA-eligible, sorted by location ("Numbering Plan, Appendix A").

(c) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

(d) Various databases evidencing number assignment, including the Local Exchange Routing Guide (LERG), various line-type identification databases[11,12], and Central Office Code Assignment Records from the North American Numbering Plan Administrator (NANPA).

**Methods and Tools Used to analyze Records.**

18. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the

---

should be used only for compliance with the Commission's do-not-call requirements." (FCC 18-177, para 26)

[11] The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books.

[12] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3). ). I was not the expert in *Perrong v Caller Identified as Connor*, nor did I provide the data.

database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

19. When analyzing call records, I start by creating a database to serve as a repository for the call records and any other related records. I then create database tables to accumulate the results of the associated DNC queries that I run against the FTC's national DNC database – queries that tag each call with a "*yes*" in the field indicating that the telephone number been on the DNC registry for more than thirty (30) days.

20. Finally, if asked, I also then create a set of tables to accumulate the results of the other identifiers related to the telephone numbers, such as *isPorted*, *isWireless*, *mostRecentPortDate*, *state*, and *operating (telephone) company*[13],[14] that can be used to identify whether a number was wireless, or wireline, and if ported, the date when the number had moved, or transitioned from one carrier to another.

21. By using a set of standardized SQL queries, I am able to tag each record according to (a) any data field contained in the call records, including the telephone number called, the date of a telephone call and its' duration (and/or) the disposition of

---

[13] This full information is available by sending a subpoena to the current successor Local Number Portability Administrator ("LNPA").

[14] "someone could subpoena iconectiv for that information, but it wouldn't be part of his subscription to the service." (PMQ testimony of iConectiv taken 11/13/2025, in *Michael Smith et al. v Examworks et al*, Case No. 1:21-cv-02509, DC, Md., page 104, attached as ECF 228-1 to *Federal Michael Anthony et al v. The Federal Savings Bank et al*, Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

any call; and, (b) any data field contained in any associated leads records; and, (c) whether the telephone number to which the call had been placed was assigned to a cellular service.

22. This is precisely the task that I will undertake for Plaintiff in this matter, guided by my many years of experience with these precise tasks. I construct all SQL statements myself and am the sole author of all work product associated with the methodologies I propose.

**Steps I will take to Organize and Analyze the Call and Text Records.**

23. I will start by opening each of the files that contain call and/or text message records data (collectively referred to as "Call Detail Records" or "CDRs"). I do this to (a) determine the format that the records are stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the calls and text messages.[15]

24. I will then import the CDRs file into SQL database tables using Microsoft SQL™ Enterprise Manager. I will then place the totality of the calls and text messages into a database called *dbo.calls*, upon which I will run SQL statements.

25. I will then apply a set of filters to include only calls and text messages:

a. that were made either (a) to a number that contained precisely ten digits and started with a 2 through 9, or (b) to a number that contained precisely eleven digits and started with a 1 followed by a 2 through 9; and,

b. that were contained within structurable data; and,

c. that had an associated date; and,

d. that contain a disposition or duration indicating the transmission of a call and/or text message.

[15] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

26. To identify calls and text messages made to numbers on the DNC, I will then tag each of the calls and text messages within the database that I constructed with information from the national DNC files that I receive from the Federal Trade Commission.

27. I will then exclude from the database any calls and text messages to telephone numbers that (a) that were not called and/or text messaged two (2) or more times in a twelve (12) month period by or on behalf of the Defendant, and/or (b) that were not registered on the DNC for thirty days before the date of each of the calls and/or text messages. [16]

28. By doing so, I will be able to identify any calls and text messages that were made to telephone numbers (a) that were called and/or text messaged two (2) or more times in a twelve (12) month period by or on behalf the Defendant, and (b) that were registered on the DNC for more than thirty (30) days before the date of each of the calls and/or text messages.

29. To identify which of these remaining calls were made to cellular telephone numbers, I will then tag all of the telephone numbers with the carrier type, and whether the number had been ported within fifteen (15) days of the call being made.

30. To identify prerecorded calls made to cellular telephone numbers, I will apply a filter to each of the calls in the database that I constructed to exclude any calls that do not have a disposition and/or duration indicating the transmission of a pre-recorded or artificial voice message.

31. With these two steps, I will be able to omit any calls that were not made to a number assigned to a wireless service for more than fifteen (15) days at the time of the call.

---

[16] Though October 8, 2026, TelSwitch, Inc. has processed 3,956,831,410 call detail records against the national DNC list and reliably and accurately tagged which of those calls were to numbers that were on the national DNC list for more than thirty (30) days before the call.

32. As a result, I will be able to identify which calls resulting in the transmission of a pre-recorded or artificial voice message in the CDRs were made to telephone numbers assigned to a cellular telephone service that had not been ported within fifteen days prior to the calls.

**Identification of subscribers and Line-Classification by Telephone Number.**

33. As described previously, I use commercially available databases to identify those numbers that are (or were) wireless or wireline line classification type of telephone numbers when the call was made, along with other attributes such as the operating company number.

34. The line classification type processing engine allows a file containing phone calls (or texts) to be tagged with labels indicating whether the number called, or texted, was wireless (colloquially known as "isWireless") and the host Operating Company Number ("OCN").

35. Using the information from the Defendant's and/or Defendant's third-parties' own files, I am able to apply the return-results from various commercially available databases, including fields representing whether the number is wireless, is ported, the LRN itself, the date of the last LRN change, and Operating Company Number.[17]

36. By using the information contained within the CDRs, I am able to attribute the Carrier (Company) of Record and Operating Company Number of telephone numbers that were validly formatted and contained and were part of the FTC's DNC-eligible area codes. I am also able to determine which calls are to numbers that were assigned to a phone carrier on the date that the number was called or texted, and whether the numbers were part of the United States portion of the

[17] The carrier-of-record and operating company number, in combination with the Telephone Number, colloquially called "MDN" or "ANI", provide the necessary fields for the creation of export files that are used by the various telephone companies in the Common-Language presentation-format expected by the Local Exchange Carriers or Wireless Exchange Carriers that host the telephone numbers, to provide subscriber information for each number, including through subpoena.

North American Numbering Plan ("NANP") or the expanded area[18] on the date when contacted.

37. By using the *Operating Company Number* (e.g. carrier of record) from the data, I am able to build an Electronic Data Interchange ("EDI") record exchange database from the CDR records and organize it by carrier for the purpose of structuring the data into the correct EDI format that is in the expected layout that they are familiar with. The csv. files, organized by carrier, can, if necessary, be utilized in subpoenas to telephone carriers to determine contact information, and/or any other information desired from the carrier, by structuring the data into a format that the carriers already use for exchanging data between and amongst themselves will facilitate as much of a response as is possible.

**Telephone Companies databases maintain subscriber information in electronic format as part of their standard record keeping.**

38. Wireless and wireline carriers maintain historical records that can be used to identify the contact information associated with telephone numbers. As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain items that are responsive to subpoenas. They also use this information to for their own customer service purposes.

39. The line type and customer information attributes are maintained by telephone companies in a manner that allows the telephone companies to verify who are their customers. This is accomplished through shared implementation of the Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle such requests using a common set of data attributes.

40. I have become familiar with EDI and the manner in which telephone companies maintain these records to handle their own customer service and reporting

[18] Canada and some Caribbean islands that use the North American Numbering Plan but are not part of the United States Dialing Area.

requirements. Both in my role in providing billing and customer service software to phone companies and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

41. As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which belonged to which subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls (and texts) for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

42. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, and maintaining accurate customer information, because Tel-One was expected to work with the proper department, depending upon the type of the product being offered.

43. In sum, Telephone companies maintain the name and address and line classification type of the telephone numbers that they maintain. An example of T-Mobile's responses to a similar subpoena request (properly redacted) is attached hereto:

| 1 | RequestedStartDate | RequestedStopDate | PHONE_NUMBER | ACCT_HOLD_FIRST_NM | ACCT_HOLD_LST_NM | ACCT_TYP_DESC | ACCT_SUB_TYP_DESC | BILLG_ADDR_PRMRY_LN_TXT |
|---|---|---|---|---|---|---|---|---|
| 23279 | 2/7/2024 | 2/7/2024 | 4296 | | | Individual | MCSA | |
| 23280 | 4/10/2023 | 4/18/2023 | 4982 | | | Individual | Regular | |
| 23281 | 5/8/2023 | 5/18/2023 | 6413 | | | Individual | Regular | |
| 23282 | 6/13/2023 | 6/26/2023 | 2385 | | | Individual | MCSA | |
| 23283 | 5/18/2023 | 5/29/2023 | 6117 | | | Individual | MCSA | |
| 23284 | 9/26/2023 | 10/9/2023 | 8741 | | | Individual | MCSA | |
| 23285 | 5/10/2023 | 5/18/2023 | 1102 | | | Individual | Regular | |
| 23286 | 12/23/2021 | 2/21/2022 | 3212 | | | Individual | Regular | |
| 23287 | 3/10/2023 | 4/7/2023 | 5950 | | | Individual | Regular | |
| 23288 | 4/22/2022 | 5/12/2022 | 7004 | | | Business | Retail | |
| 23289 | 7/13/2022 | 7/13/2022 | 0518 | | | Individual | Regular | |
| 23290 | 12/20/2021 | 12/24/2021 | 0724 | | | Individual | Regular | |
| 23291 | 12/6/2022 | 12/19/2022 | 8443 | | | Individual | Regular | |
| 23292 | 3/13/2024 | 3/14/2024 | 4655 | | | Individual | Regular | |
| 23293 | 8/14/2023 | 8/15/2023 | 4710 | | | Individual | Regular | |
| 23294 | 6/27/2022 | 6/27/2022 | 2872 | | | Individual | Regular | |
| 23295 | 1/9/2023 | 1/16/2023 | 2771 | | | Business | Corporate | |
| 23296 | 5/23/2023 | 6/5/2023 | 7050 | | | Individual | Regular | |
| 23297 | 3/7/2022 | 3/28/2022 | 1385 | | | Individual | MCSA | |
| 23298 | 3/22/2023 | 3/23/2023 | 0226 | | | Individual | MCSA | |
| 23299 | 6/30/2022 | 6/30/2022 | 9861 | | | Individual | Regular | |

**Conclusions.**

44. Using the national DNC list, I was able to identify that the named plaintiff's number ending in -2295 has been contiguously on the national DNC list since at least 01/06/2020.[19]

45. I was also able to determine that the named plaintiff's number ending in -2295 has been contiguously assigned to a wireless service during the proposed putative class period:

| PHONE NUMBER | VOICE PROVIDER |
|---|---|
| [redacted]2295 | Verizon Wireless |

46. It is my opinion that methodology that I outlined in this Declaration, which is consistent with that that I had applied on behalf of the plaintiff in the *Federal Savings* and *Spring EQ* matters, that I can reliably determine which calls and text messages in the records maintained by or on behalf of Defendant were made to telephone numbers that were called and/or text messaged two (2) or more times in a twelve (12) month period by or on behalf of the Defendant, and that were registered on the DNC for more than (30) thirty days before the date of each of the calls and/or text messages using the call and text message records that have been and will be produced in this matter.

47. In order to apply my methodology, I require records of calls, either in

---

[19] *See,* Exhibit 7.

the form of the raw call records themselves, or, minimally, records of calls transferred to Defendant 33 Mile in the event that the call records are unobtainable from the telephone company or the entity that placed the calls.

48. It is also my opinion that, if I was provided them, using the call records described above and maintained by or on behalf of Defendant, there is a reliable method to identify which calls in the call records (a) were made to telephone numbers assigned to a cellular telephone service that had not been ported within fifteen days of the calls, and (b) resulted in the transmission of pre-recorded or artificial voice messages.

49. And it is my opinion that there is a reliable method to identify calls and text messages with other particular criteria based on the additional types of information included in the CDRs, records of leads, and/or other records maintained by or on behalf of Defendant or in any available database.

50. Finally, I also understand that there is a reliable method to identify the individuals to whom telephone numbers belong. This is because wireless and wireline carriers maintain historical records that can be used to identify the residential or business classification for any particular phone number, as well as contact information, which can be obtained from a number of sources[20], including the carriers themselves by querying the FCC's databases maintained by the North American Numbering Plan Administrator and the Local Number Portability Administrator.[21]

---

[20] I understand that Carla Peak, expert for Saggio in *Jason Saggio et al v. Medicredit, Inc.* (Case No. 4:22-cv-01005-JAR, ED, Mo, Eastern Div.) described a method that could be reliably applied to further identify those proposed putative class members, using data from PacificEast, Nexxa, or Lexis Nexis" to identify residential class members. *See* decl. Peak, doc. 108-1 at 2-13 (*Jason Saggio et al v. Medicredit, Inc.*) and depo. Peak, doc. 108-2 (*Jason Saggio et al v. Medicredit, Inc.*) The court's order (ECF 126) is attached as Exhibit 8.

[21] TelSwitch, Inc. reply comments to FCC Notice of Proposed Rulemaking "Combatting Illegal Robocalls Through FCC Numbering Policies, WC Docket 26-49" (Exhibit 9) (https://www.fcc.gov/ecfs/document/26109987506/1 last visited 10/09/2026)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 12, 2026 in Pleasant Hill, California.

Aaron Woolfson